IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SIMPLY SNACKIN, INC. and JASON ISANBERG, | : | Civil No. 1:17-CV-0381 |
| Plaintiffs, | : | |
| v. | : | |
| S-L DISTRIBUTORS and SNYDER'S-LANCE, | : | Judge Sylvia H. Rambo |
| Defendant. | : | |

# **M E M O R A N D U M**

In this diversity action, Plaintiff asserts claims for breach of contract, tortious interference with contractual relations, and civil conspiracy. Presently before the court is Defendants' motion to dismiss the amended complaint for failure to state a claim. (Doc. 52.) For the reasons set forth below, the court will grant Defendants' motion in part and deny it in part.

## **I. Background**

For purposes of disposition of the instant motion to dismiss, the court has carefully reviewed the amended complaint and will, as required when deciding a motion to dismiss, accept as true all well-pleaded factual allegations and view them in the light most favorable to Plaintiff.

### A. Facts

On or about February 22, 2015, Plaintiff, Simply Snackin, Inc.[1] ("Simply Snackin"), a New York corporation, entered into a Distributor Agreement (the "Agreement") with S-L Distribution Company, Inc. ("S-L"), a corporation with offices located in both New York and Pennsylvania. (Doc. 49, ¶¶ 3, 6, 10.) Under the Agreement, Simply Snackin was granted: a) the exclusive right to sell Snyder's of Hanover or Lance chips and other snack products (collectively, "Products") to specified supermarkets and retail outlets in Westchester County, New York (the "Territory"), and b) the non-exclusive right to sell Products to other current or potential customers in the Territory. (*Id.* at ¶ 10; Doc. 52-3, Arts. 3(A), 3(B).) Three of the stores in Simply Snackin's Territory were owned and operated by Stop & Shop, specifically Stop & Shop supermarkets designated as 501, 502, and 591. (Doc. 49, ¶ 11.) Under the Agreement, Plaintiff was required to periodically visit the stores in its distribution route, restock Products as needed, and credit the stores for any expired or damaged inventory either not stocked or removed from the shelves. (*Id.* at ¶ 10; Doc. 52-3 at Arts. 5(A), 5(C).)

---

[1] Plaintiff Jason Isanberg concedes that he cannot remain a party in this action in an individual capacity. (Doc. 47, ¶ 3.) Thus, all of Isanberg's claims are dismissed with prejudice.

In the event that Simply Snackin breached the Agreement by failing to service customers within the Territory, the Agreement states that:

> If Distributor fails to maintain satisfactory services or fails to meet the requirements of its customers within the Territory, to any segment or part of the Territory, to any Authorized Outlet or to any other store or retail outlet within the Territory, and such failure is not remedied within five (5) days after receipt of written notice thereof from S-L, in addition to any other lawful remedies S-L may have under this Agreement or otherwise, S-L may deem the Territory, the segment or part, the Authorized Outlet or the other store or retail outlet within the Territory to be abandoned and may make other arrangements for the sale of Products thereto.

(Doc. 52-3 at Art. 13A.)

Article 15(B)(2) of the Agreement also provides:

> In the event of any other breach of this Agreement or the terms hereof by Distributor, S-L shall provide Distributor with five (5) business days written notice of the breach within which time Distributor must cure the breach to S-L's reasonable satisfaction. If Distributor fails to cure such breach within said five (5) day period, this Agreement and Distributor's rights with respect to the Territory may be immediately terminated by S-L without further notice.

(*Id.* at Art. 15(B)(2)).

Plaintiff duly performed its obligations for almost a year without incident or complaint. (Doc. 49, ¶ 12.) On or about February 20, 2016, Jason Isanberg ("Isanberg"), the president and sole owner of Simply Snackin, was servicing Stop & Shop store 501. (*Id.* at ¶ 15.) While Isanberg was still in the store, a complaint was made that uncredited Products were discovered among cardboard boxes bound for destruction. (*Id.* at ¶ 17.) The grocery manager, after consulting the store

manager, told Isanberg "not to worry about it." (*Id.* at ¶ 18.) Plaintiff left the Product in question, which was allegedly in saleable condition, and left the store. (*Id.*) The complainant also reported the incident, along with prior similar incidents, to Stop & Shop's security arm. (*Id.*) Stop & Shop subsequently communicated this to Snyder's-Lance[2] ("Snyder's") and barred Plaintiff from servicing the store. (*Id.* at ¶ 20.)

On February 23, 2016, Simply Snackin was "admonished" and barred from servicing store 501. (*Id.* at ¶¶ 19, 20.) This was communicated to Simply Snackin via email by John Walsh ("Walsh"), allegedly the zone manager of Snyder's for Westchester County and other areas in New York state. (*Id.* at ¶¶ 14, 20.) Subsequent calls and emails from Simply Snackin to Walsh were unreturned. (*Id.* at ¶ 20.) Ultimately, Simply Snackin was "summarily barred" in writing by Walsh and one Andy Semenza from store 501 and the two other Stop & Shop stores. (*Id.*) Simply Snackin nevertheless continued to service its distribution route and contacted Stop & Shop store management, who did not object to Simply Snackin continuing to service its stores. (*Id.*)

On February 29, 2016, Simply Snackin was barred from the warehouse and not permitted to buy any Products. (*Id.*) Additionally, Simply Snackin's handheld computer was deactivated on the same day. (*Id.*) Plaintiff alleges that Defendants

---

[2] Plaintiff has not alleged the type of relationship between S-L and Snyder's, although Defendant states that S-L is a subsidiary of parent entity Snyder's. (Doc. 52, ¶ 30.)

did not provide any assistance in resolving the situation with Stop & Shop despite its obligation to do so under Article 21 of the Agreement. (*Id.* at ¶ 26.) Article 21 states:

> Distributor shall receive, and promptly investigate and handle, all complaints received from its customers or prospective customers and in so doing shall seek to protect the goodwill of the Products. All complaints received by Distributor which cannot be readily remedied by Distributor shall be promptly reported in writing, to S-L and thereafter S-L and Distributor will seek to work jointly together to reasonably remedy any such complaint. In the event that Distributor is unable to receive such complaints, or in the event that Distributor's customers contact S-L directly regarding complaints, then S-L will communicate said complaint to Distributor, so that Distributor may address the complaint as promptly as possible.

(Doc. 52-3 at Art. 21).

### B. Procedural History

On May 9, 2017, Defendants filed a motion to dismiss the complaint for failure to state a claim, and a brief in support thereof. (Docs. 40 & 41.) Plaintiffs responded by submitting a document entitled "Affidavit in Opposition." (Doc. 47.) On June 15, 2017, the court deemed Plaintiffs' response to Defendants' motion to dismiss to be an amended complaint. (Docs. 48 & 49.) On July 12, 2017, Defendants filed a motion to dismiss the amended complaint for failure to state a claim, along with a brief in support thereof. (Docs. 52 & 53.) On the same day, Plaintiffs submitted a document entitled "Objections to Motion or in the Alternative Request for a [Briefing] Schedule." (Doc. 54.) On July 18, 2017, the

court denied both Plaintiffs' objection to inadequate notice and request for an extension of time. (Doc. 55.)

Plaintiffs timely filed a brief in opposition to Defendants' motion to dismiss on July 25, 2017. (Doc. 56.) On August 8, 2017, Defendants filed a reply. (Doc. 61.) Thus, the motion has been fully briefed and is ripe for disposition.

## II. <u>Legal Standard</u>

Defendants move to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's short and plain statement of the claim must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Further, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of

action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (internal citations omitted) (citing *Twombly*, 550 U.S. at 555, 557). However, this "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *W. Penn Allegheny Health Sys. Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (quoting *Phillips*, 515 F.3d at 234). When conducting this inquiry, the court considers "the allegations in the complaint, exhibits attached to the complaint[,] and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). The court may "also consider 'undisputedly authentic' documents where the plaintiff's claims are based on the documents and the defendant has attached a copy of the document to the motion to dismiss." *See Vicky M. v. Ne. Educ. Intermediate Unit*, 486 F. Supp. 2d 437, 449 (citing *Pension Benefit Guar. Corp.,* 998 F.2d at 1196).

The court has jurisdiction over this matter on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332. In order for jurisdiction to exist, each defendant must be a citizen of a different state from each plaintiff. *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 373 (1978). As a federal court sitting in diversity, the court must apply the choice of law rules of the state in which it sits.

7

*See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).

## III. Discussion

Defendants have moved to dismiss the amended complaint in its entirety for failure to state a claim. Thus, the court will review each count contained in the amended complaint, in turn, to determine whether Plaintiff has sufficiently pleaded any claims that will survive Defendants' motion.

### A. Breach of Contract

#### 1. Count I

In Count I, Plaintiff asserts that S-L breached the Agreement by preventing Plaintiff from servicing its distribution route through the following acts: a) barring Plaintiff from the warehouse where it purchased Products for distribution; b) deactivating the handheld computer used by Plaintiff in servicing the distribution route; and c) "[taking] the stores from [Plaintiff]" and servicing them directly through the warehouse.[3] (Doc. 49, ¶¶ 19, 20.) Defendant S-L argues that Article 13(A) of the Distributor Agreement gives S-L the right after the five-day notice

---

[3] Plaintiff attributes this last action specifically to Walsh, whom Plaintiff alleges to be an employee of Snyder's, not S-L. (Doc. 49, ¶ 20.) Plaintiff does not initially specify who barred it from purchasing products at the warehouse and deactivated its handheld computer (e.g., whether it was S-L acting under the direction of Snyder's), although it later attributes the warehouse lockout to Snyder's. (Doc. 49, ¶¶ 20, 29.)

8

and cure period to make other arrangements for the sale of Products. (Doc. 52, ¶¶17-20).

To state a cause of action for breach of contract, a plaintiff must plead the following elements: a) "the existence of a contract, including its essential terms;" b) "a breach of a duty imposed by the contract;" and c) "resulting damages." *Reed v. Chambersburg Area Sch. Dist.*, 951 F. Supp. 2d 706, 726 (M.D. Pa. 2013) (citing *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006)).

In the instant case, Plaintiff does not dispute that Stop & Shop notified Snyder's that Plaintiff was barred from servicing the store. (Doc. 49, ¶ 20.) This preclusion from servicing all the stores in the distribution route can be construed as a breach of Plaintiff's duty to "distribute and deliver for consideration various edible products to the various retail stores." (Doc. 49, ¶ 10; *see* Agreement at Art. 5(A) ("[D]istributor . . . shall . . . sell Products to Authorized Outlets and other stores and retail outlets within the Territory . . . .").)

Under Article 13(A) of the Agreement, if Plaintiff had not remedied its expulsion from Stop & Shop within five days after receipt of the notice on February 23, 2016, S-L did not act improperly in making "other arrangements for the sale of Products," including servicing the Stop & Shop stores itself. (Doc. 52-3 at Art. 13(A).) Similarly, under Article 15(B)(2), if the expulsion was not remedied within five *business* days, S-L was free to terminate the Agreement. (*Id.*

at Art. 15(B)(2).) Thus, the issue of breach turns on whether Plaintiff can be construed as having remedied its expulsion from the Stop & Shop supermarkets by February 28, 2016.

In this respect, Plaintiff asserts that he "continued to service the route and did contact the Stop & Shop store management, who had no objection to him continuing on." (Doc. 49, ¶ 20.) Plaintiff purportedly "continued to service the stores until [February 29, 2016, when it] was barred from the warehouse and . . . not allowed to purchase any product." (*Id.* at ¶ 25.) At this early stage, these statements are sufficient for the court to reasonably infer in favor of Plaintiff that any breach on its part had been cured. Thus, S-L's actions in barring Plaintiff from the warehouse and purchasing Products, as well as deactivating Plaintiff's handheld computer could constitute a breach of the Agreement by S-L, and Plaintiff has alleged it was damaged by such breach. Accordingly, Plaintiff has met its pleading burden and the court will deny the motion as to this count.

### 2. Count II

Under Count II, Plaintiff alleges that S-L provided no assistance in resolving the issue with Stop & Shop, which Plaintiff asserts S-L was required to do under Article 21 of the Agreement. (*Id.* at ¶ 26.) Specifically, Plaintiff alleges that "[p]rior requests by Plaintiff to his managers and Snyder's manager's legal department to assist him in obtaining from Stop & Shop copies of their inquiry or

security films were ignored, as were any attempts to meet and discuss the situation with Plaintiff." (*Id.* at ¶ 24.) Plaintiff asserts that S-L's lack of assistance with respect to resolving the issue with Stop & Shop constituted a breach of Article 21:

> Distributor shall receive, and promptly investigate and handle, all complaints received from its customers or prospective customers and in so doing shall seek to protect the goodwill of the Products. All complaints received by Distributor which cannot be readily remedied by Distributor shall be promptly reported in writing, to S-L and thereafter S-L and Distributor will seek to work jointly together to reasonably remedy any such complaint. In the event that Distributor is unable to receive such complaints, or in the event that Distributor's customers contact S-L directly regarding complaints, then S-L will communicate said complaint to Distributor, so that Distributor may address the complaint as promptly as possible.

(Doc. 52-3 at Art. 21.) In response, S-L argues that there is nothing in the Agreement that obligated it "to lobby Stop & Shop to reconsider or reverse its exclusion of Simply Snackin from Stop & Shop supermarkets." (Doc. 52, ¶ 21.) S-L relies on the plain language of Article 21, arguing that, pursuant to the third sentence of Article 21, because Stop & Shop communicated the complaint directly to S-L, S-L only had to communicate the complaint to Simply Snackin so Simply Snackin could promptly address the complaint. (Doc. 53, p. 13.)

Plaintiff does not address S-L's plain-language argument, but rather relies on the second sentence of Article 21, which states that "[a]ll complaints received by Distributor which cannot be readily remedied by Distributor shall be promptly reported in writing, to S-L and thereafter S-L and Distributor will seek to work

11

jointly together to reasonably remedy any such complaint." (Doc. 52-3 at Art. 21.) Although S-L's argument that the third sentence relieved S-L from working with Plaintiff to resolve the issue with Stop & Shop because S-L received the complaint directly from Stop & Shop, a plain reading of the second sentence of Article 21, which requires S-L to work with Plaintiff to resolve "*all* complaints," could apply whether the complaint was received by Distributor directly from the customer, or indirectly through S-L, as here. Because the plain language of Article 21 could support Plaintiff's assertion, the court will deny S-L's motion as to Count II.

### 3. Claims against Snyder's

Plaintiff names Snyder's as a defendant in its breach of contract claims. Snyder's argue that, because Plaintiff does not allege the existence of a contract between Plaintiff and Snyder's, or anything in the Agreement to impute Snyder's as a party, there can be no breach of contract with Snyder's. (Doc. 52, ¶ 17.) "[I]f one is not a party to the contract, one cannot breach it." *Mericle v. Jackson Nat'l Life Ins. Co.*, 193 F. Supp. 3d 435, 445 (M.D. Pa. 2016) (quoting *Electron Energy Corp. v. Short*, 597 A.2d 175, 179 (Pa. Super. Ct. 1991)). Plaintiff asserts no basis for the court to find otherwise. Accordingly, the court will dismiss both Counts I and II for breach of contract against Snyder's with prejudice, as any amendment would be futile. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) ("Among the grounds that could justify a denial of leave to

amend are undue delay, bad faith, dilatory motive, prejudice, and futility.") (citation omitted).

## B. Tortious Interference with Contractual Relations (Count III)

Plaintiff alleges that "[b]y refusing the Plaintiff access to the [Stop & Shop] stores and to the warehouse, Defendant [Snyder's] assisted in damaging contractual relations between Plaintiff" and its supplier, S-L. (Doc. 49, ¶ 29.) Plaintiff states in its complaint that "the lockout of the warehouse was intended without justification, to deprive Plaintiff of [its] route despite servicing it from February 23rd through February 29th." (*Id.* at ¶ 30.) Plaintiff attributes this conduct to Snyder's. (*Id.* at ¶ 29.) Further, Plaintiff alleges that the notice received "accusing" it of not servicing its route, as well as the subsequent termination of the Agreement, were acts "designed with malice, to deprive the Plaintiff of [its] right to a livelihood." (*Id.* at ¶ 32.) Finally, Plaintiff alleges that Snyder's was attempting "to retake the three [Stop & Shop] stores and service them from [its] warehouse directly, and save the costs of the 'middle man.'" (*Id.* at ¶ 37.)

Defendants argue that Plaintiff's tortious interference claim against Snyder's is fatally flawed because Plaintiff "fails to allege any purposeful act by Snyder's specifically intended to harm Simply Snackin's contractual relationship with S-L,"

and because Plaintiff has failed to allege that any actions by Snyder's were not privileged. (Doc. 52, ¶¶ 25, 30.)[4]

Under Pennsylvania law, the elements of a cause of action for intentional interference with contractual relations are: "a) the existence of a contractual . . . relation between the complainant and a third party; b) purposeful action on the part of the defendant, specifically intended to harm the existing relation . . . ; c) the absence of privilege or justification on the part of the defendant; and d) the occasioning of actual legal damage as the result of the defendant's conduct." *Mifflinburg Telegraph, Inc. v. Criswell*, Civ. No. 14-cv-0612, 2017 WL 4310187, \*26 (M.D. Pa. Sept. 28, 2017). The second and third elements are "closely intertwined," requiring a showing that defendant's actions were both not privileged and were improper. *Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 934 (Pa. Super. Ct. 2013) (citing Restatement (Second) of Torts § 766); *Mifflinburg Telegraph*, 2017 WL 4310187 at 28 *(*citing *Empire Trucking*, 71 A.3d at 934) ("Pennsylvania has adopted the Restatement Second of Torts proposition that the interference must be improper, i.e., without privilege or justification.").

---

[4] Defendants argue that the same claim against S-L must fail because a party cannot interfere with its own contract. (*Id*. at ¶ 33.) The court agrees. "[I]t is axiomatic that a party cannot tortiously interfere with its own contract." *Bakare v. Pinnacle Health Hosps., Inc.*, 469 F. Supp. 2d 272, 294 n.46 (M.D. Pa. 2006) (citing *Rutherfoord v. Presbyterian–Univ. Hosp.*, 417 Pa. Super. 316, 612 A.2d 500, 507–08 (1992)). Accordingly, the court will dismiss this claim against S-L with prejudice.

In evaluating whether or not an actor's conduct has been proper, the Third Circuit has noted that Pennsylvania courts are guided by factors based on the Restatement (Second) of Torts § 767, specifically: the nature of the actor's conduct; the actor's motive; the interests of the other with which the actor's conduct interferes; the interests sought to be advanced by the actor; the social interests in protecting the freedom of action of the actor and the contractual interests of the other; the proximity or remoteness of the actor's conduct to the interference; and the relations between the parties. *See Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1388 (3d Cir. 1991) (citing *Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 393 A.2d 1175, 1184 (Pa. 1978)) (further citation omitted). "[W]here an actor is motivated by a genuine desire to protect legitimate business interests, this factor weighs heavily against finding an improper interference." *Univ. Graphics, Inc. v. Pro-Image Corp.*, 913 F. Supp. 338 (M.D. Pa. 1996) (quoting *Windsor Sec. Inc. v. Hartford Life Ins. Co.,* 986 F.2d 655, 665 (3d Cir. 1993)); *see also Green v. Interstate United Mgmt. Servs. Corp.*, 748 F.2d 827, 831 (3d Cir. 1984). For instance, in *Green,* the Third Circuit found that interference was proper where the parent entities instructed their wholly-owned subsidiary not to sign a lease tendered by plaintiff after an independent appraiser had determined that the lease was a bad bargain, based on a motive "to prevent dissipation of the resources of their wholly-owned subsidiary." *Green*, 748 F.2d at 831.

Here, Plaintiff has asserted sufficient factual statements to support intentional actions by Snyder's (specifically through its alleged employee Walsh), *i.e.*, the warehouse lockout and Agreement termination, with the alleged intent of retaking the distribution route to remove the "middle man" costs. However, Plaintiff has not asserted any factual statements to show that Defendant Snyder's conduct was improper, *i.e.*, without privilege or justification, merely stating that Defendant's conduct was "without justification." Moreover, the alleged intent of reducing distribution costs could be construed as a legitimate business interest, and would weigh against a finding of improper interference. Thus, the court will dismiss Count III against Snyder's without prejudice.

### C. Civil Conspiracy (Count IV)

Plaintiff alleges that Snyder's and S-L acted in collusion to deprive Plaintiff of its contractual rights. (Doc. 49, ¶ 36.) Snyder's was allegedly attempting "to retake the three [Stop & Shop] stores and service them from [its] warehouse directly, and save the costs of the 'middle man.'" (*Id.* at ¶ 37.) Plaintiff reiterates that its attempts to contact Walsh from February 23rd through 27th were ignored, and that Defendant Snyder's sent a letter to Plaintiff advising that the Agreement was terminated for failure to service the distribution route. (*Id.* at ¶¶ 38, 39.) While Plaintiff was soliciting the sale of its distribution to recover its losses, Defendants

allegedly "purposely . . . interfered with the sale and failed to timely send . . . information" to be shown to prospective buyers. (*Id.* at ¶¶ 42, 50.)

Defendants argue that Plaintiff fails to "'allege the manner in which a conspiratorial scheme was devised and carried out,' or facts to support the inference that S-L and Snyder's had combined or entered [into] an agreement in order to carry out the alleged unlawful acts." (Doc. 52, ¶ 36.) Defendant also argues that Plaintiff must prove an underlying tort as a predicate for civil conspiracy liability: because the underlying claim of tortious interference with contractual relations fails, the civil conspiracy claim must fail as well. (*Id.* at ¶ 37.)

Although the amended complaint is somewhat unintelligible with regard to Count IV, for purposes of the instant motion, the court will treat it as a claim for civil conspiracy. A civil conspiracy "requires that two or more conspirators reached an agreement to commit an unlawful act or perform a lawful act by unlawful means." *Festa v. Jordan*, 803 F. Supp. 2d 319, 327 (M.D. Pa. 2011) (citing *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979); *Burnside v. Abbott Laboratories*, 505 A.2d 973, 980 (Pa. Super. Ct. 1985)). Additionally, a plaintiff must show an overt act and actual legal damage. *Festa*, 803 F. Supp. 2d at 327 (citing *Phillips v. Selig*, 959 A.2d 420 (Pa. Super. Ct. 2008) (internal citations omitted)). Finally, malice, *i.e.*, an intent to injure, must be

shown. *Id.* (citing *Commerce Bank/Pennsylvania v. First Union Nat'l Bank,* 911 A.2d 133, 143 (Pa. Super. Ct. 2006)).

The court finds that Plaintiff's allegations are insufficient to sustain a claim for civil conspiracy. First, because malice "can only be found when the *sole* purpose of the conspiracy is to injure the plaintiff," Plaintiff's allegation that Defendants' actions were to remove "middle man" costs and retake the distribution route negates a finding of malice. *See Festa*, 803 F. Supp. 2d at 327 (citing *Bro–Tech Corp. v. Thermax, Inc.,* 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009) (dismissing a civil conspiracy claim based on a theory that defendants "acted for their business advantage and benefit," because this business motive was inconsistent with acting "purely out of malice")). Second, given that the underlying claim of tortious interference with contractual relations has been dismissed, the civil conspiracy claim must fail as well. *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 788 (3d Cir. 1999). Thus, any claim for civil consipiracy contained in Count IV will be dismissed.[5]

## IV. <u>Conclusion</u>

For the reasons stated herein, the court finds that Plaintiff has failed to state a claim for relief for Counts III and IV, and those claims will be dismissed in their

---

[5] With respect to S-L, because the underlying claim of tortious interference with contractual relations will be dismissed with prejudice, so will the claim for civil conspiracy contained in Count IV.

entirety. The court further finds that Plaintiff has failed to state a claim against Defendant Snyder's in Counts I and II, and those claims will be dismissed. Plaintiff has, however, pleaded sufficient facts to state a claim against Defendant S-L in Counts I and II, and those claims will not be dismissed.

An appropriate order will issue.

                                             s/Sylvia H. Rambo
                                             SYLVIA H. RAMBO
                                             United States District Judge

Dated: December 6, 2017